Our second case this morning is Peter Jokich v. Rush University. All right. I see both counsel. We can proceed. Mr. Jokich. Good morning, everyone. Good morning, Your Honors. We have today before us two cases, essentially. One, a breach of contract case. The second, a retaliation case under the civil rights laws. Both of which cases were terminated at summary judgment. And we believe that in both cases, there are genuine issues of material fact that entitle us to present our case to the jury. With respect to the first case, the contract case. We believe that there are facts that support our position that the August of 2016 signed agreement with a condition precedent that was not satisfied was nonetheless performed fully by both parties for two years until August the 23rd of 2018 when the contract was broken by Rush. This performance was deliberate, knowing, and intentional. Rush was certainly aware of the fact that there was a condition precedent in the contract that had not been met or fulfilled. Nonetheless, both parties fully performed for two years from August of 2016 to August of 2018 all their obligations under the agreement. Rush contends that about halfway through this period, in other words, somewhere near June or July, I believe it was June of 2017, an amendment was tendered by Rush that Rush thought had been signed, mistakenly thought had been signed. And therefore, Rush's position is that any performance after that period was based on the 2017 amendment and not on the 2016 contract. Again, another very serious issue of fact, because the 2017 agreement called for certain metrics to be put in. It called for a replacement for Dr. Jokic to be identified. None of these things were done in the period between 2017 and 2018. The performance continued to be under the contract of 2016. In addition to that, the law, we believe, is quite clear that Rush cannot rely on a mistake that they thought that Dr. Jokic had signed the 2017 agreement when it would have been relatively easy for them to have determined that he had not signed it. There is some additional evidence that the committee was aware of that, but in any event, the point of law that we rely upon is quite simple. They, Rush, cannot be allowed to rely on its mistaken belief that the contract was signed by Dr. Jokic when a simple effort on their part would have discovered that it had not been signed. For these two reasons, performance continued during the period from 2017 to 2018 consistently with the 2016 agreement and not consistently with the 2017 agreement. No effort was made to remove Dr. Jokic, to begin to move him, to find a replacement. No effort was made to insert a metrics evaluation in the performance. Instead, the terms of the 2016 agreement, and I would like to focus the court for a moment on that agreement. The heart of that agreement was the long-range strategic plan that Rush needed to have put in place over the next five years. In fact, the first thing that Dr. Jokic was required to do between in the first year of the contract was to come up with a five-year strategic plan, which he did, 60-some page, five-year strategic plan. That was essential to that contract. And that contract then called for other metrics to be met in each of the succeeding five years. Both parties fully performed for the two years that followed the signing of the contract. If I could clarify the chronology here. The court declined to approve the 2016 contract. And this is in addition to this. This is the supplemental contract. The background faculty employment agreement remained in place throughout, correct? Well, the faculty employment agreement for Dr. Jokic was superseded by the five-year agreement. The faculty employment agreement signed by Dr. Jokic had an addendum to it saying if there's any conflict between the one-year faculty employment agreement and the multi-year agreement, the multi-year agreement would. Right. No, I understand that. But the multi-year agreement that you're relying on here is this 2016 contract, correct? It's the only contract signed by both parties, yes. We are relying on that contract. Well, the 2016 contract was not approved by the Board of Trustees, and that's the problem. Correct. And that disapproval occurred in October, to get back to the chronology question. That was October of 2016, is that right? Yes, it was submitted. This contract was submitted in October of 2016 to the board. The board believed, based on the evaluation that had been done by the consultants, that if he exceeded the 90th percentile, board approval was necessary. However, there's a fact question about whether he exceeded the 90th percentile. The report indicated that it approached the 90th percentile. I don't understand this to be a claim that's challenging the decision of the Board of Trustees not to approve the contract. I understood your claim to be a wide waiver or estoppel. Yes, that's correct. Your client understands that the board did not approve the contract, and that is October of 2016. And then the parties immediately began to work together to try to put in place a contract that could be approved, and that resulted in the 2017 contract, which came into being sometime in the spring of 2017. So over that six-month period, the parties are working together toward a new supplemental contract, except your client didn't sign that contract. Correct. All we have in place is the background contract and continued payment of bonuses during that interim period. Well, in other words, both parties fully performed during that period. Payment of bonuses was part of that to the entire team, and also additional vacation time, additional CLEs, thousands of dollars were paid. It was a matter of good faith, though, not contractual entitlement, because the parties were negotiating toward an agreement that everybody could accept. And that never came to fruition because your client didn't accept the 2017 contract. But to the objective test for implied waiver, and I don't think we have any good estoppel argument here because there isn't reliance, but the objective test that applies to implied waiver, the parties demonstrated by their words and deeds that they understood that that 2016 contract was not effective and in place. It's just that Rush was paying your client salary benefits bonus in good faith to further the negotiations because he was a good doctor. And at that point, they wanted to keep him, right? I think that's correct. I think that during that period, both sides understood that performance under this signed agreement of 2016 was being done despite the fact that a condition precedent had not been met. Everyone was aware of that. And nonetheless, both sides continued to perform. And that, we believe, rushes performance, the performance of Dr. Jokic for two years under the two- It's a matter of good faith in the continued negotiations, not as an implied waiver. If they were negotiating toward a contract that everyone could accept and that the board could sign off on and approve, that runs contrary to any argument that there was an implied waiver by words and deeds here. If we accept the fact that both sides were working in good faith toward this, I think that is consistent with the waiver because both sides were aware, Rush was aware of the fact that there was a condition precedent in the contract. Nonetheless, Rush and the plaintiff, both being aware that there was a condition of the precedent of the contract that had not been met, continued to perform fully in good faith. But there was performance. I'm not questioning the good faith. They certainly could have been in good faith because they knew that the condition precedent had not been met. The condition and performance was going to continue despite the fact that the condition precedent had not been met. And the parties would then attempt to see if they could negotiate an agreement that would be acceptable. However, I have to point out that 2017 amendment called for something that was very much contrary to the original contract when it called for him to work toward his removal, a replacement, and bringing in a replacement. That was a fundamentally different proposition in the amendment that he rejected. Nonetheless, if we accept the fact that both parties were performing in good faith, that I think is a point that, looking at it from our point of view, supports the waiver because both parties understood there was a condition precedent that hadn't been met. Nonetheless, knowing that, performance. And that performance constituted the waiver that we're arguing. We're not disputing the good faith, Your Honor. We believe that our position is totally consistent with Rush acting in good faith. They knew that the condition precedent hadn't been met. Nonetheless, they were performing. That's an intentional knowing, giving up of a right that they were not asserting at that time when they were performing in good faith. I believe good faith supports us, Your Honor. I believe it. That's a fact. If you look at it from our point of view, in the light favorable to us, that good faith supports us. They're performing in good faith. We're not questioning that. But that, I think, emphasizes, doesn't undercut the fact that they knew that this provision had not been met. That's what they were trying to do, see if we can get a provision that or see if we can get an amendment that will work. Unfortunately, the amendment inserted a clause that Dr. Yilkes was never going to sign to train and work for getting this replacement. That wasn't in the original contract. We're not questioning good faith in the performance. I think that just points out that the performance was done intentionally and deliberately, despite the fact that everyone knew there was a condition. We believe that fact supports us, Your Honor. You are running out of time. Did you want to save some? I would like to save for rebuttal. Ms. Duffy-Gideon. Thank you, Your Honor. Roisin Duffy-Gideon for Rush. On the contract claim, I want to just quickly sort out the various arguments at play here. For context, as Your Honor mentioned, at all times before June 30th, 2019, Dr. Yilkes had a standard faculty employment agreement, which all Rush-employed doctors have, for the most part. And we refer to this as an FEA. And it had a one-year term that renewed automatically each July, unless either party gave 120 days written notice. Dr. Yilkes wanted a term longer than one year, and so at various times in the past, and again in 2016, he worked on negotiating with Rush a longer-term contract. His arguments are now conflating two versions of that contract, neither of which ever took force. So first, he negotiated a 2016 agreement that would have given him a four-year term. The problem, of course, is that that agreement was conditioned on board approval, and the board rejected it. There was no dispute that the board rejected it, or about the fact that Dr. Yilkes was told so. And in fact, as you just discussed, Rush and Dr. Yilkes negotiated to try to come up with a mutually agreeable amendment. The board ultimately approved an amended version in June 2017. That amendment, to be clear, left many aspects of the 2016 agreement untouched, including the requirement for a strategic plan, but added just a couple of things, including productivity standards. The problem with that amendment is that Dr. Yilkes refused to sign it and chose not to tell anyone. And there's no dispute of fact about that either. His brief says, and Mr. Pavich just represented, that he didn't want to sign it. He knew he wasn't signing it. And in his testimony, he said the reason was that he found the new productivity standards insulting. So ultimately, Dr. Yilkes was trying to have his cake and eat it, too. He wanted the benefit of a longer-term agreement without any productivity standards. But the board rejected one agreement, and he rejected the other. So what he ended up with, by his own choice, is no long-term agreement at all. I'd like to quickly address Dr. Yilkes' argument that he could assume waiver because Rush paid him his fiscal year 2017 bonus without, he says, I believe, verifying whether he'd met the productivity standards required by the new 2017 amendment. And there are two problems with that. First of all, there are no facts in the record on this issue. He simply didn't try to prove that he didn't meet those new productivity standards. Dr. Krishnan, who was the dean at the time, was the person who approved that bonus. Dr. Yilkes had the opportunity at his deposition to ask him why he did that, whether he considered the productivity standards. And he just didn't ask that question. So for all we know, Dr. Yilkes did meet the productivity standards for the fiscal year 2017. And that wouldn't necessarily be surprising. The evidence makes clear that the new productivity standards, while they were essential for board approval, they weren't necessarily all that onerous after the party's negotiations. The second thing is, even if payment of the bonus were misleading under the estoppel theory, Dr. Yilkes hasn't proved any reliance on it. And, of course, if he were going for true implied waiver, there would have to be clear, unequivocal, and decisive conduct by the board inconsistent with any intention other than to waive. Payment of a bonus that wasn't deserved, if that's what happened, doesn't amount to good evidence of intent by the board. So Dr. Yilkes' briefing sort of obscures this, but it's clear that the two legal arguments he's relying on are estoppel and implied waiver. It's basic Illinois case law what's required for each that this court has recognized for years. And just to recap, under the first theory, true implied waiver, there has to be clear, unequivocal, and decisive evidence conduct inconsistent with any intention other than to waive. The evidence doesn't support that. And for estoppel, Yilkes would have to prove that Rush misled him and that he reasonably relied on that misrepresentation. As far as misleading conduct goes, no jury could conclude that Rush misled Dr. Yilkes. Dr. Yilkes was perfectly aware that the board rejected the initial agreement, simply decided not to sign the proposed amendment, and chose himself not to tell anyone. And there's no reliance. Never until this lawsuit did he tell anyone he thought the 2016 agreement was in effect. So his claim that he would have left the institution otherwise flies in the face of common sense, given what we know that he knew. As to the board's mistake of fact as to whether he signed that 2017 amendment, of course that's an unfortunate mistake. Rush wishes it had caught it sooner. But when he argues that he's owed some sort of equitable assumption based on that, he's conflating the two agreements again. There's no mistake that the condition precedent that's really at issue, whether the board approved the 2016 amendment, that condition precedent failed. Everyone agrees with that. Rush's mistake was as to whether Dr. Yilkes signed the 2017 amendment. But you can't enforce an agreement that you didn't make. The testimony, the evidence, the briefing is clear. Dr. Yilkes did not make that agreement, and he doesn't even try to enforce it now. I'll move to the retaliation claim, which Dr. Yilkes has brought under Title VII and the ADA. I'd like to be very clear about the timeline here because it's quite well documented. The decision to remove Dr. Yilkes was made on May 22, 2018. That decision was the culmination of a years-long deterioration in the relationship between Dr. Yilkes and leadership at Rush, in which he told them essentially time and again that they were doing a poor job running the place and he knew how to do it better. The record documents many such conflicts over the years that Dr. Yilkes hasn't claimed and couldn't claim are protected either by Title VII or by the ADA. In the last instance, on May 22, 2018, Dr. Yilkes sent an email to over 60 people, including his direct supervisor, the dean, the COO, and the CEO, in which he said that Rush's leadership and board were in it for the money, not looking out for the community, and didn't have the Rush mission embedded in their hearts. And again, Dr. Yilkes hasn't claimed that this email was protected, and he couldn't. So the question at the heart of the retaliation claim is, could any reasonable person in Dr. Yilkes' position, after all the escalating conflicts he'd had with Rush over the past couple of years, expect to keep his job after sending an email like that? The answer to that question, surely, is no. So, unsurprisingly then, the record includes a mountain of evidence that the decision to remove Dr. Yilkes was made that very day, May 22, 2018. On that date, his direct supervisor, Dr. DeCrease, emailed Dean Krishnan, asking for approval to remove him, and got approval on that same day as well from COO Mike Dandorf and CEO Dr. Larry Goodman. Just four days later, on May 26, Dr. DeCrease wrote a memo to HR stating that he'd decided to remove Dr. Yilkes. He wasn't looking for approval. He wasn't looking for input. The decision had been made. HR then the next day hired outside counsel, and on June 6, you have a draft removal letter from outside counsel that also clearly shows the decision to remove Dr. Yilkes had been made, and the only question left was how to carry it out. In the face of that evidence, Dr. Yilkes is down to just one remaining allegation of protected activity occurring before May 22. That's a statement to Patience Nelson, who'd been hired to investigate a complaint against him, that he thought the complaint had been made in order to dissuade him from testifying in someone else's lawsuit. That statement can only be described as a conspiracy theory, and it just doesn't cut it to create a tribal jury issue for at least two reasons. The first reason is that it's not the kind of activity that Title VII protects, and the second reason is that no reasonable jury could find that it caused Dr. DeCrease's decision to remove him a full six weeks later. It's not clear in the record that Dr. DeCrease even saw that line in Ms. Nelson's report. Dr. Yilkes didn't ask him that at his deposition. And even if he had, the timing just isn't suspicious, either by the standards of case law or common sense, especially when viewed in light of Dr. Yilkes' May 22 email. As for Dr. Yilkes' June 2018 emails to Dr. Goodman and then to HR alleging discrimination, in order for them to get him anywhere, Dr. Yilkes essentially has to argue to the jury, convince the jury, that his superiors didn't really decide to remove him in May, and all the evidence showing that they did is just wrong, or that the decision was made in May, abandoned for some unnamed reason, and then made again after these June emails, even though the draft removal letter from counsel was meant to rush just five days before the first of the two June emails were sent. There's no evidence to support either of those stories. And of course, as Dr. Yilkes states many times, we have to draw all reasonable inferences in his favor, but that doesn't mean that he gets to make up what might have happened out of whole cloth. Dr. Yilkes has no document or testimony to dispute a single fact in Rush's statement of facts. That includes the contract history and the conflicts that led to his removal and what Rush did to carry it out. Judge Lefkoe considered those facts, considered his minimal circumstantial evidence, and after reviewing the entire record, found that no reasonable jury could find for Dr. Yilkes. She was right about that. As for Dr. Yilkes' argument under the Faculty Employment Agreement, briefly, he's again confusing two different things. There are two ways the FEA can end by its own terms. Either party can non-renew at the end of a term with 120 days written notice, or Rush can terminate the agreement before the end of a term with cause. Dr. Yilkes is saying he was let go without cause, but there's no provision in the FEA requiring cause for a non-renewal at the end of a term, and there's no dispute that that's the route Rush took. It certainly didn't terminate the agreement as a whole. It continued to pay Dr. Yilkes a salary and benefits until the FEA expired, and Dr. Yilkes accepted those payments. And then finally, as to Dr. Yilkes' argument that his removal as division director violated the medical staff bylaws, he's referring to a provision there that says the division director, quote, shall be appointed and shall serve solely at the discretion of the department chairperson. That language is obviously intended to deny tenure, but Dr. Yilkes is trying to twist it the other way to make it harder to remove him. As the district court recognized, if this provision gives rights to anyone, it's to Dr. Byrd, and she clearly exercised her discretion not to object to the removal decision. And that's just not surprising under the undisputed facts. From the moment she became chair, Dr. Byrd was mostly uninvolved in supervising Dr. Yilkes. Her testimony made clear that she didn't see it as her job for a variety of institutional reasons. Dr. Yilkes' removal was decided on by his supervisor, Dr. DeCrease, and approved by the dean, Dr. Krishnan, who was also Dr. Byrd's supervisor, by the way, as well as the CEO and the COO. What Dr. Yilkes is arguing, ultimately, is that even though the highest levels of hospital leadership wanted him gone, he can't be removed because the idea didn't start with Dr. Byrd, even though she had no objection to it. That interpretation of the provision is absurd, it would turn corporate governance on its head, and there's nothing in the language of the bylaws that would require it. If the court has no further questions, we'll rest on our brief. Thank you. Mr. Kadich. Yes, I think that... I think one thing that's been made clear, the condition preceding the contract had not been fulfilled. Everybody knew that. Rush knew it, and yet, intentionally, deliberately, knowingly, continued to perform for two years. That constitutes conduct by waiver. With respect to reliance, of course, Dr. Yilkes relied on this 2016 agreement. He put together a five-year strategic plan, and most importantly, he forgo... He did not take the opportunity to look elsewhere. He wanted a multi-year agreement. He made that clear to everyone that he needed a multi-year agreement. If he did not get a multi-year agreement, he would then be looking elsewhere for employment. He made no effort to do that. He relied on the performance, the good faith performance of both sides, for two years under the contract, under the agreement. With respect to the retaliation, counsel didn't, I think, didn't even mention the fact that we have two adverse acts here that we'd focused on, not just one. The court found that there was protected activity in Dr. Yilkes' testimony. His participation in a federal lawsuit involving Rush and Norma Melgoza. That lawsuit also focused, in large part, his participation would be in relation to testimony against Dr. Decrees, regarding whether or not he had worn a Trump mask in the course of the interview with Norma Melgoza. That was protected activity. His participation in that is protected activity. The court found that. Now, the act, the adverse act that we're talking about is not seven weeks later. It's a mere three or four or five days later, when on April the 17th, Dr. Decrees had Ms. Nedved demote him and take away all of his off-site responsibilities. Now, the court found that because that didn't affect his pay or his job title, it was not an adverse act. But the court, as a matter of law, was wrong on that because a significant change in one's job responsibilities may constitute an adverse act. Now, the question is, was there a significant change when he was demoted five days later from all of his responsibilities, not demoted, but stripped of all his job responsibilities for the off-sites? That was a significant change in his responsibility, in his duties, because if you look at the contract that he was performing, much of that contract related to long-term strategic planning in the off-sites, the five or six off-sites that he was planning for. So there was a significant change in his responsibilities. That constituted an adverse act. Now, was Dr. Decrees motivated by the testimony? Yes, there's evidence that he, and the court has found the protected activity was that Dr. Jokic was identified as a witness in the Malgoza case. Now, finally, with respect to the protected activity in June, the decision of May 26th was never taken. They, in their brief, cite Ms. Schott, to whom the email of May 26th was sent, and she said, we took a different path. We did not act on that decision. Mr. Pavich, your time has expired, so you're going to have to wrap up. I think that if you look carefully at the chronology, you'll see that there was no decision that was taken. No action was taken. The action was taken in August after the protected activity in June arrived. Thank you. Thank you very much, and thanks to both counsel. The case is taken under advisement.